**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 26-1044**

———————

SIERRA CLUB; APPALACHIAN VOICES; 7 DIRECTIONS OF SERVICE,

     Petitioners,

v.

NORTH CAROLINA DEPARTMENT OF ENVIRONMENTAL QUALITY; D. REID WILSON, in his official capacity as Secretary of the North Carolina Department of Environmental Quality; RICHARD E. ROGERS, JR., in his official capacity as the Director of the Division of Water Resources of the North Carolina Department of Environmental Quality,

     Respondents,

and

MOUNTAIN VALLEY PIPELINE, LLC; DUKE ENERGY CAROLINAS, LLC; DUKE ENERGY PROGRESS, LLC,

     Intervenors - Respondents.

———————

On Petition for Review of a Decision of the North Carolina Department of Environmental Quality.  (Certification No. WQC008395)

———————

Argued:  April 28, 2026                       Decided:  June 11, 2026

———————

Before GREGORY, WYNN, and THACKER, Circuit Judges.

———————

Motion for stay pending review denied by published opinion.  Judge Wynn wrote the opinion, in which Judge Gregory and Judge Thacker joined.

———————

**ARGUED:** Derek Owen Teaney, APPALACHIAN MOUNTAIN ADVOCATES, Lewisburg, West Virginia, for Petitioners. Taylor Hampton Crabtree, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Respondents. Jeremy C. Marwell, VINSON & ELKINS, LLP, Washington, D.C., for Intervenors. **ON FILING:** Blakely E Hildebrand, Chapel Hill, North Carolina, Alyson R. Merlin, SOUTHERN ENVIRONMENTAL LAW CENTER, Asheville, North Carolina, for Petitioners 7 Directions of Service. Jeff Jackson, Attorney General, Asher P. Spiller, Senior Deputy Attorney General, Brenda Menard, Special Deputy Attorney General, Alexandra Farrell, Assistant Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Respondents. Misha Tseytlin, Kevin M. LeRoy, Chicago, Illinois, Melinda L. McGrath, Anais M. Jaccard, TROUTMAN PEPPER LOCKE LLP, Charlotte, North Carolina, for Intervenors Duke Energy Carolinas, LLC and Duke Energy Progress, LLC. Garrett T. Meisman, VINSON & ELKINS LLP, Houston, Texas, for Intervenor Mountain Valley Pipeline, LLC.

———————

WYNN, Circuit Judge:

Federal courts do not grant the extraordinary remedy of a stay pending review absent a strong showing that the movant is likely to succeed on the merits.

Three environmental groups petition this Court to stay a water quality certification ("the Certification") issued by the North Carolina Department of Environmental Quality ("NCDEQ") for the Southgate Project, a proposed pipeline that will traverse portions of North Carolina and Virginia. Although the petition for review is currently undergoing full merits briefing, Petitioners have not made a strong showing that they are likely to succeed on the merits of their petition to warrant preliminary relief in the form of a stay of the Certification pending our review.

Accordingly, we deny Petitioners' motion to stay the Certification pending our review.

## I.

The Southgate Project is a proposed extension of the Mountain Valley Pipeline ("Main Pipeline"), a project that has generated years of litigation in this Court and beyond. The Main Pipeline is "an approximately 304-mile, forty-two-inch diameter pipeline," extending through West Virginia and Virginia, with about two-thirds of its route lying in West Virginia. *Sierra Club v. W. Va. Dep't of Env't Prot.*, 64 F.4th 487, 494 (4th Cir. 2023). Mountain Valley Pipeline, LLC ("MVP") began construction on the Main Pipeline in 2018, setting off administrative and judicial challenges concerning the project's

environmental compliance and federal approvals.[1] MVP ultimately placed the Main Pipeline in service in June 2024. *Mountain Valley Pipeline, LLC*, 193 FERC ¶ 61,222, 2025 WL 3690705, at *1 n.7 (Dec. 18, 2025) [hereinafter FERC Decision].

MVP initially filed an application for the Southgate Project with the Federal Energy Regulatory Commission ("FERC") in 2018. *See Mountain Valley Pipeline, LLC v. N.C. Dep't of Env't Quality*, 990 F.3d 818, 823 (4th Cir. 2021). It proposed a pipeline extending from "an interconnect in Pittsylvania County, Virginia, to delivery points in Rockingham and Alamance Counties, North Carolina." FERC Decision at *1. In June 2020, FERC issued MVP "a certificate of public convenience and necessity authorizing the construction and operation of the Southgate Project." *Id.* But the Southgate Project got tied up in litigation pertaining to the Main Pipeline, including in this Court. *See Mountain Valley Pipeline*, 990 F.3d at 823–25, 827. Additionally, in 2020, NCDEQ denied a water quality certification for the Southgate Project (a decision we vacated in 2021). *Id.* at 825, 833; *see id.* at 823 (explaining States' role in pipeline permitting under Clean Water Act).

Following completion of the Main Pipeline in 2024, MVP revamped its plans for the Southgate Project, "reduc[ing] the length of the pipeline route from" a total of "75 miles to 31.3 miles and increas[ing] the diameter of the project pipeline" from a maximum of 24

---

[1] In 2023, "Congress proactively intervened by legislation" and stripped "our jurisdiction over" some pending petitions related to the Main Pipeline. *Appalachian Voices v. U.S. Dep't of the Interior*, 78 F.4th 71, 75 (4th Cir. 2023) (citing Fiscal Responsibility Act of 2023, Pub. L. No. 118-5, § 324, 137 Stat. 10, 47). That legislation does not apply here, so we possess jurisdiction over this case pursuant to the Natural Gas Act. *See* 15 U.S.C. § 717r(d)(1); Fiscal Responsibility Act § 324(a), (e)(1); *Appalachian Voices*, 78 F.4th at 80–81.

inches to 30 inches. FERC Decision at *1; Dkt. No. 38-3 at 17.[2] The revised plan substantially decreased the length of the segment of the proposed pipeline falling within North Carolina, from 48 miles to 5.2 miles. *See Mountain Valley Pipeline*, 990 F.3d at 821; Dkt. No. 38-8 at 2.

Thereafter, MVP sought new permits for the revised proposal, filing an amended application with FERC in February 2025 and a new application for a water quality certification with NCDEQ in May 2025. NCDEQ received public comments in July 2025, including from Petitioners, and held a hearing in August 2025. On November 7, 2025, the hearing officer who presided over the public hearing issued a report and recommendation. After "consider[ing] all the public comments, the public record, the relevant rule sets, [and] the application for the project," as well as "consult[ing] with [Division of Water Resources] staff conducting the review of this project," the hearing officer recommended that NCDEQ grant the Certification. Dkt. No. 38-8 at 2. NCDEQ agreed and issued the Certification on November 12, 2025. Dkt. No. 38-2 at 4. FERC then issued an order amending the 2020 certificate of public convenience and necessity in December 2025. FERC Decision at *1.

Petitioners sought review of NCDEQ's Certification in this Court on January 12, 2026.[3] MVP, Duke Energy Carolinas LLC, and Duke Energy Progress LLC joined the case

---

[2] In light of the preliminary posture of this case, the parties have not yet filed a Joint Appendix but have instead attached relevant documents as exhibits to their motion-related filings. For ease of reference, we cite the parties' filings using the docket number and the page number generated by our Case Management/Electronic Case Files system in red font at the top of the page.

[3] On March 31, 2026, Petitioners filed a petition for review of FERC's December 2025 decision in the D.C. Circuit. *See* Petition for Review at 1–2, *S. All. for Clean Energy*

as intervenors.[4]

As of October 2025, "initial clearing activities" related to the Southgate Project were "estimated to begin in the fourth quarter of 2026 (if all necessary approvals and clearances have been obtained)," with actual pipeline construction to begin "in early 2027." Dkt. No. 38-3 at 21. But on January 30, 2026, MVP filed an "implementation plan" with FERC stating that it "anticipate[d] commencing construction activities in March 2026." Dkt. No. 44-16 at 2, 21 (capitalization altered). About three weeks later, MVP informed FERC that it intended to begin construction as early as March 17, 2026. Dkt. No. 38-4 at 2–3. So, on March 6, 2026, Petitioners filed a motion for a stay of the Certification pending our review of their petition. Dkt. No. 38.

The parties and intervenors completed their filings on the stay motion on March 19, with MVP and the Duke Energy Intervenors filing a joint response in opposition to the motion. The next day, MVP received a permit from the U.S. Army Corps of Engineers. Dkt. No. 46 at 1.

On March 27, MVP filed a letter in this Court stating that it had "adjusted its proposed construction schedule" and would not "begin construction in North Carolina

---

*v. Fed. Energy Regul. Comm'n*, No. 26-1071 (D.C. Cir. Mar. 31, 2026), Dkt. No. 1. *Compare* 15 U.S.C. § 717r(d)(1) (granting this Court "original and exclusive jurisdiction" to review State Clean Water Act certifications), *with id.* § 717r(b) (allowing petitioners to seek review of FERC decisions in either this Court or the D.C. Circuit). That petition remains pending as of the date of this opinion.

[4] The Duke Energy Intervenors have an interest in the Southgate Project because they have "entered into a contract" with MVP to use the Southgate Project's "firm transportation capacity once the Southgate Project is operational." Dkt. No. 29 at 2; *see* FERC Decision at *2.

6

earlier than April 6, 2026." *Id.* at 2. Additionally, as of March 27, MVP had "neither sought nor received authorization from FERC to begin construction of Southgate Project facilities in North Carolina." *Id.* at 1. By contrast, it received construction authorization from FERC for the Virginia side of the Project on March 23. *See id.*; Notice to Proceed with Partial Construction at 1, *Dan River Basin Ass'n v. Va. Dep't of Env't Quality*, No. 26-1220 (4th Cir. Mar. 23, 2026), Dkt. No. 48-2.

In light of the fast-moving nature of the case and the complicated issues raised in the petition and stay motion, on March 30, we issued a temporary administrative stay of the Certification "until further Order of the court" and scheduled oral argument related to the stay motion.[5] Dkt. No. 47 at 2. After holding oral argument on April 28, 2026, we issued an order on April 29 lifting the temporary administrative stay and denying the stay motion, with an opinion to follow. Dkt. No. 56 at 2. We now set forth our reasoning.[6]

## II.

Petitioners seek a stay of NCDEQ's Certification pending our review of their petition. To determine whether to grant such a stay, we must apply the traditional four-

---

[5] We did the same regarding a similar stay motion filed by other petitioners (some of which overlap with Petitioners here) in a case arising from a certification granted by the Virginia Department of Environmental Quality. Corrected Court Order at 2, *Dan River Basin Ass'n v. Va. Dep't of Env't Quality*, No. 26-1220 (4th Cir. Mar. 31, 2026), Dkt. No. 52 (correcting March 30 order). We issue an opinion setting forth our reasoning in that case simultaneously with this opinion. *See Dan River Basin Ass'n v. Va. Dep't of Env't Quality*, No. 26-1220, slip op. (4th Cir. June 11, 2026).

[6] In the intervening period since we heard oral argument and entered our denial order, Petitioners have filed their opening brief on the merits. For purposes of this opinion, we consider only the arguments presented by the parties in their filings related to the stay motion and at oral argument on that motion.

factor stay test, considering (1) "whether the stay applicant has made a strong showing that he is likely to succeed on the merits," (2) "whether the applicant will be irreparably injured absent a stay," (3) "whether issuance of the stay will substantially injure the other parties interested in the proceeding," and (4) "where the public interest lies." *Sierra Club v. U.S. Army Corps of Eng'rs*, 981 F.3d 251, 256 (4th Cir. 2020) (per curiam) (quoting *Nken v. Holder*, 556 U.S. 418, 426 (2009)). "The first two factors . . . are the most critical." *Nken*, 556 U.S. at 434. And "[t]he party requesting a stay bears the burden of showing that the circumstances justify an exercise of [our] discretion" to grant such relief. *Id.* at 433–34.

In our view, the final three factors together tilt modestly in Petitioners' favor. We have previously found those factors to favor the petitioners in a similar challenge. *Sierra Club*, 981 F.3d at 264–65. And here, notably, MVP initially did not plan to begin construction until late this year.

We conclude, however, that Petitioners have not carried their burden to demonstrate a strong showing of likelihood of success on the merits. Their modest showing on the other three factors is not enough to overcome that deficiency. Accordingly, we deny the stay motion.

A.

"We review North Carolina's [water quality] certification decision under the standards set forth in the" Administrative Procedure Act.[7] *Mountain Valley Pipeline*, 990

---

[7] This Court has previously "questioned whether State standards might be more appropriate for review of State agency actions," but has left the matter unresolved "because North Carolina's standards for reviewing State agency actions are materially identical to"

F.3d at 826. The Administrative Procedure Act requires this Court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). At the same time, "[t]his standard is highly deferential, with the presumption in favor of finding the agency action valid." *Nat'l Audubon Soc'y v. U.S. Army Corps of Eng'rs*, 991 F.3d 577, 583 (4th Cir. 2021) (cleaned up). Further, "the agency is owed particular deference when exercising its judgment in resolving factual disputes that implicate substantial agency expertise and that require the agency to balance often-competing interests. And when an agency is called upon to make complex predictions within its area of special expertise, a reviewing court must be at its *most* deferential." *Id.* (cleaned up).

Petitioners argue that NCDEQ's decision to grant MVP the Certification was deficient for two reasons: First, NCDEQ failed to rationally explain its prediction that the Southgate Project will not cause violations of water quality requirements, in light of MVP's history of noncompliance during construction of the Main Pipeline; and second, NCDEQ failed to include conditions that its hearing officer relied upon in recommending that it grant the Certification. We consider these arguments in turn and conclude that Petitioners have not made a strong showing that they are likely to satisfy the highly deferential level of review under either theory.

## B.

First, we consider the compliance prediction. Federal regulations require the

---

the federal Administrative Procedure Act's. *Mountain Valley Pipeline*, 990 F.3d 826 n.5. The parties have not asked us to revisit that conclusion here.

Certification to include a "statement that the [Southgate Project] will comply with water quality requirements." 40 C.F.R. § 121.7(c)(3). Additionally, North Carolina's regulations require NCDEQ to "evaluate if the proposed activity . . . would cause or contribute to a violation of water quality standards." 15A N.C. Admin. Code 2H.0506(b). In their public comments on MVP's application to NCDEQ, Petitioners argued that, "[b]ased on MVP's demonstrated history of water quality violations, [NCDEQ] cannot find that the Project is not likely to cause or contribute to water quality standards violations." Dkt. No. 38-12 at 19. They pointed to this Court's 2023 decision in *Sierra Club v. West Virginia Department of Environmental Protection*, in which we found West Virginia's "reasonable assurance determination to be arbitrary and capricious because it failed to provide a reasoned explanation as to why it believe[d] MVP's past permit violations w[ould] not continue to occur going forward." *Sierra Club*, 64 F.4th at 501. Petitioners also noted MVP's history of violations in Virginia during construction of the Main Pipeline there.

In his report and recommendation, NCDEQ's hearing officer rejected this concern. In their stay motion, Petitioners argue that they are likely to succeed on the merits of their claim that NCDEQ's analysis of this objection was arbitrary and capricious. We are not convinced.

MVP's previous conduct is certainly relevant to a prediction regarding its future compliance. But the prior violations cited by Petitioners occurred in different states, were subject to different water quality standards enforced through different mechanisms, and pertained to a different, substantially larger project (the 300-mile Main Pipeline—with about 100 miles in Virginia and about 200 miles in West Virginia—rather than the 5-mile

portion of the Southgate Project running through North Carolina).

Our prior decision in *Sierra Club* is distinguishable. There, we considered a petition on the merits, rather than in the preliminary posture we have here. We concluded that West Virginia had been arbitrary and capricious when it failed to sufficiently explain why MVP would not be expected to repeat violations it had already committed dozens of times in West Virginia on the same project. *Id.* at 498, 501–03. Our analysis was further informed by the fact that, at the same time that it was predicting future compliance, West Virginia had indicated that the number of prior violations was unsurprising—a "blatant contradiction in its reasoning" that we concluded "le[ft] its explanation wanting." *Id.* at 502.

We clarified, however, that "[t]his is not to say that previous violations of water quality standards create a per se bar against certification." *Id.* at 505. Rather, "because the fact of MVP's compliance [ran] counter to the actual record evidence" in that case, we concluded that West Virginia "ha[d] a duty to give a reasoned explanation for its continued reliance on MVP's compliance . . . in the face of MVP's violation history." *Id.*; *accord id.* at 502 ("In its certification, [West Virginia] assumed MVP's compliance with [West Virginia's general permitting program would] ensure compliance with water quality standards going forward. Yet the record is replete with evidence contrary to [that] conclusion. Not only had MVP violated the [state permit] 139 times over the course of two years, but Department inspectors found that MVP committed at least forty-six narrative water quality standards violations and assessed civil penalties against MVP for permit and water quality violations totaling $569,678.").

11

Despite the caveats to our conclusion that we set forth in *Sierra Club*, Petitioners ask us to take two additional steps here: to conclude, in this preliminary posture, that they have made *a strong showing* that NCDEQ made an arbitrary and capricious decision when it declined to conclude that MVP's prior activities *in other projects subject to different standards* meant that MVP was likely to commit violations in the instant project. But their motion does not provide sufficient justification for taking those two further leaps.

North Carolina's hearing officer explained why he rejected Petitioners' concern about future noncompliance. He stated that "a dedicated environmental inspector will be present during all in-stream construction activities"; the Southgate Project's "construction must comply with the Stormwater Design Manual, which follows the Minimum Design Criteria outlined in the [North Carolina] Stormwater Rules and Regulations"; and NCDEQ "maintains a strong enforcement program for all issued authorizations," including that "MVP will be required to schedule and conduct a pre-construction meeting to understand condition compliance and shall report any non-compliance activities, including but not limited to sediment impacts to streams and wetlands," to NCDEQ. Dkt. No. 38-8 at 9.

The hearing officer's analysis on this point must also be read in the context of his response—a few pages earlier—to concerns about "the impacts of construction activities on streams," including public comments to the effect that the Southgate Project "will not comply with state water quality standards." *Id.* at 5–6. He explained, among other things, that "MVP will be required to secure an approved Erosion Control Plan prior to construction[] and commit to construction activities . . . to minimize impacts at streams and wetlands"; NCDEQ had "thoroughly reviewed" the application "to ensure that [MVP] has

documented avoidance and minimization to ensure water quality standards are protected";
and NCDEQ "will protect water quality through the conditions included in the
[Certification] and [NCDEQ]'s statutory authority to enforce the water quality standards
codified in" State regulations. *Id.* at 6–7. This context helps to flesh out the "strong
enforcement program" he cited in response to the compliance-prediction comments.

Petitioners contend that the hearing officer failed to explain why the reasons he cited
for predicting compliance were sufficient, when those same protections were in place
during the Main Pipeline's construction, and MVP still committed violations. But, of
course, the protections were not exactly the same: Again, they involved a different State's
laws, different State actors, and a different scale of project.

While the hearing officer's analysis regarding the prediction of future compliance
was succinct, he identified elements of North Carolina's regulatory regime that, in his view,
would help keep MVP honest. "It is of course always possible to explore a subject more
deeply and to discuss it more thoroughly," but "[s]o long as the agency provides an
explanation of its decision that includes a rational connection between the facts found and
the choice made, its decision should be sustained." *Mountain Valley Pipeline*, 990 F.3d at
831–32 (cleaned up). And here, we owe particular deference to the agency because the
hearing officer's prediction implicates the agency's area of special expertise:
"determining" whether a "proposed activity will comply with state water quality standards"
and "ensur[ing] compliance with . . . the Clean Water Act and with State water law." 15A
N.C. Admin. Code 2H.0506(b), .0507(c).

Petitioners have another opportunity, in merits briefing, to explain why the agency's

13

judgment was sufficiently deficient to justify our intrusion in its certification process. For present purposes, however, Petitioners have not made a strong showing that they are likely to succeed on their argument that the analysis was arbitrary or capricious.

C.

Second, we consider the included conditions. The Certification included enforceable conditions pursuant to NCDEQ's authority under State regulations.[8] In Petitioners' second merits argument, they point to three elements that they say the hearing officer erroneously assumed would be conditions of the Certification, but were not: requirements that MVP (1) comply with a stormwater management plan, (2) coordinate construction with another pipeline being built in the same area, and (3) implement controls suitable for High Quality Waters. They contend that NCDEQ's failure to include these conditions, despite the hearing officer's reliance on them, rendered its decision arbitrary and capricious. Dkt. No. 38-1 at 20 (citing *Sierra Club*, 64 F.4th at 506, 509). But Petitioners have not made a strong showing that they are likely to succeed on establishing the premise of this argument: that the conditions were not included in the Certification.

That's because Condition 2 of the Certification provides that "[t]he plans and specifications for this project are incorporated by reference as part of" the Certification.[9]

---

[8] *See* 15A N.C. Admin. Code 2H.0507(c) ("Any [North Carolina water quality certification] may contain such conditions as the Director [of the Division of Water Resources] shall deem necessary to ensure compliance with . . . the Clean Water Act and with State water law. The conditions included in the certification shall become enforceable by [NCDEQ] . . . when the federal permit or license is issued.").

[9] MVP and NCDEQ also point to a number of other conditions as being relevant to this analysis. For purposes of this opinion, we rely only on Condition 2 because we

14

Dkt. No. 38-2 at 6. Condition 2 further states that, if MVP sells the property, it is to provide the new owner with a copy of the Certification "*and all plans and specifications incorporated by reference*" and must submit a letter to NCDEQ stating that "the terms and conditions of" the Certification, "*including the responsibility to ensure compliance*, are binding on the new owner(s)." *Id.* (first emphasis added; some emphasis omitted).

Condition 2 does not define "plans and specifications." But the opening paragraphs of the Certification arguably provide some clarity. There, the Certification granted MVP "authorization for the impacts listed [in the Certification], as described within [MVP's] application received by the N.C. Division of Water Resources" on May 30, 2025, "and subsequent information on July 15, 2025, September 12, 2025, and October 28, 2025." *Id.* at 4. It also stated that "[t]he State of North Carolina certifies that this activity will comply with water quality requirements and the applicable portions of" the Clean Water Act "*if conducted in accordance with the application, the supporting documentation, and conditions hereinafter set forth*." *Id.* (emphasis added).

MVP committed to performing each of the elements Petitioners say is missing from the Certification in its application or subsequent responses to requests for information. *See* Dkt. No. 44-4 at 66 (application) ("In North Carolina, the Amendment Project construction must comply with the Stormwater Design Manual, which follows the Minimum Design Criteria outlined in the North Carolina Stormwater Rules and Regulations."); Dkt. No. 43

---

conclude Petitioners have not satisfied their burden based on that condition. Of course, the parties remain free to brief the applicability of the other conditions during merits proceedings.

at 100 (September 12, 2025, response to request for additional information) (explaining how MVP was "actively coordinating with" the other pipeline "to coordinate and stagger construction activities within shared workspaces"); Dkt. No. 44-13 at 6 (October 28, 2025, response to request for additional information[10]) ("Although the Amendment Project does not cross through a High Quality Water (HQW) Zone, the project will implement erosion and sediment control measures that will provide protections suitable for HQW Zones."). MVP and NCDEQ have affirmatively represented to this Court—explicitly and repeatedly—that the commitments MVP made in its application and responses to requests for information are incorporated by reference in the Certification through Condition 2's reference to the Project's "plans and specifications." *See* Dkt. No. 43 at 14–15, 20–22 (NCDEQ); Dkt. No. 44-1 at 17–20 (MVP); Oral Arg. at 21:34–22:38, 24:10–26:35, https://www.ca4.uscourts.gov/OAarchive/mp3/26-1044-20260428.mp3 (NCDEQ); *id.* at 29:15–30:11, 34:06–34:37 (MVP). "Thus, both parties to the permit shared an understanding of what the permit says and how it is to be enforced." *Sierra Club v. Va. Elec. & Power Co.*, 903 F.3d 403, 414 (4th Cir. 2018).

In their reply to the motion responses and at oral argument, Petitioners raised concerns about whether Condition 2 can be given the meaning that MVP and NCDEQ attach to it. *See* Dkt. No. 45-1 at 6–8 (citing principles of North Carolina contract law);

---

[10] The quoted letter is dated October 17 and 24, 2025. However, it appears to have been attached to an email sent to NCDEQ on October 28, 2025. *See* Dkt. No. 44-1 at 20 (citing Dkt. No. 44-12 at 2; Dkt. No. 44-13 at 6). Both MVP and NCDEQ have represented that this is the October 28, 2025, information referenced in the Certification. *See* Dkt. No. 43 at 21–22; Dkt. No. 44-1 at 20.

Oral Arg. at 11:40–12:02 (arguing that "'plans and specifications' is a term of art . . . that applies to engineering designs" and doesn't include any compliance measures). We leave those arguments—which are belated for purposes of the stay motion—to be fleshed out and further considered during the parties' merits presentations. For present purposes, however, our reading of the plain language of the Certification and the explicit representations made by MVP and NCDEQ as to its interpretation satisfy us that Petitioners have not made a strong showing that they are likely to succeed on the merits of their condition-based claim.

III.

We conclude that Petitioners have not made a strong showing that they are likely to succeed on the merits of either of their arguments, and the other stay factors cannot overcome this deficiency. This conclusion does not mean that the result of our consideration of the matter on the merits is foreordained. But it does mean that preliminary relief in the form of a stay pending review would be inappropriate. We accordingly deny the motion for a stay.

*MOTION FOR STAY DENIED*